Stephen M. FIELDING,
Plaintiff-Appellee,

v.

INTERNATIONAL HARVESTER COMPANY, a Delaware corporation; and the International Harvester Retirement Plan for Salaried Employees, Defendants-Appellants.

Nos. 86–3660, 86–4034.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1987.

Decided April 23, 1987.

Lee Wellman, Ronald H. Hoevet, Portland, Or., for plaintiff-appellee.

James H. Clarke, Portland, Or., for defendants-appellants.

Before SNEED and HALL, Circuit Judges, and AGUILAR,* District Judge.

SNEED, Circuit Judge:

Plaintiff-appellee, Fielding, was discharged by defendant-appellant, International Harvester Co., Inc., and brought suit to obtain benefits entitled "special early retirement" benefits under Harvester's ERISA pension plan. The district court held for Fielding. We reverse.

## I.

### FACTS

In 1982, International Harvester discharged Fielding as part of a reduction of sales personnel in its Oakland office. He was then 56 and had been a Harvester employee for over 32 years. On the basis

---

* Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation.

of his age and years of service, Fielding in 1982 potentially was eligible for early retirement benefits under two sections of Harvester's plan. Under Article II, section 2 of the plan, Fielding could "retire at [his] option" and thereby become entitled to "regular early retirement" benefits. Under section 3, Fielding could be "retired at the option of the Company" and thereby become entitled to higher "special early retirement" benefits.[1] After eliminating his position in Oakland, Harvester told Fielding that no other post was available to him. Fielding applied for both the regular and the special benefits. Harvester's plan administrator granted him the former but denied the latter.

In denying the special benefits, the administrator relied on Harvester's Summary Plan Description, which states:

> Special early retirement benefits are primarily reserved for employees involved in the closing of an entire Company facility and are granted at the option of the company.

At trial, Harvester introduced evidence to show a consistent policy of offering such benefits only to employees discharged when an office was entirely closed and to employees who agreed to leave in 1978 during a "window period" when Harvester wanted to reduce operations generally without actually firing any workers. Fielding does not dispute that this was Harvester's policy.

Fielding sued for the special benefits. After a bench trial, the district court held in his favor.

## II.

### STANDARD OF REVIEW

 An ERISA plan administrator's decisions are to be sustained unless "arbitrary or capricious." *Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650, 654 (9th Cir. 1981). ERISA trustees have "wide discretion 'short of plainly unjust measures' to decide questions of eligibility." *Hancock v. Montgomery Ward Trust*, 787 F.2d 1302, 1308 (9th Cir.1986). Any "reasonable" interpretation of the plan terms should be upheld. *Id.*

 To some extent this degree of deference derives from trust law rules reflecting the presupposition that trustees have no pecuniary interest in their own decisions. In many ERISA cases, however, as here, the employer administers its own plan and, in one fashion or another, may be affected financially by its decisions. As we have previously held, in such circumstances "[l]ess deference should be given to the trustee's decision." *Jung v. FMC Corp.*, 755 F.2d 708, 712 (9th Cir.1985). Nonetheless, we preserve the "arbitrary and capricious" vocabulary in these cases. And even in *Jung*-like situations, our review remains deferential. Provided that the plan terms at issue are ambiguous, we will uphold the employer's interpretation so long as it is reasonable and made in good faith. *See id.* at 713.

## III.

### DISCUSSION

The district court held that Harvester's denial of special benefits to Fielding was arbitrary and capricious. The judge gave three reasons.

### A. *Plain Meaning.*

The district court commenced with the fact that under the plan, an employee "retired at the option of the Company" is entitled to special benefits. Fielding was "retired at the option of the Company," the district court concluded. As the district court saw it, Harvester's position would require that " 'retired' mean[ ] 'terminated *plus* unilaterally granted special benefits at the discretion of the Company.' " E.R.

---

1. In Fielding's case, the regular benefits amount monthly to about $215 until the age of 65 and $175 thereafter; the special benefits would be about $490 monthly until 65 and $275 thereafter. These contested benefits are in addition to an uncontested monthly payment of $285 under the plan's contributory retirement provisions. They are, moreover, supererogatory with respect to ERISA: Harvester's plan satisfies ERISA's minimum requirements with or without the special early retirement benefits.

at 26 (opinion below) (emphasis added). Any such gloss on the term "retired" would violate the plain meaning of the term "retired," the district court concluded.

The flaw in this reasoning is that the issue is not what "retired" means. The issue in truth is what "retired at the [company's] option" means.

To be "retired" by one's employer is, of course, a euphemism. It means discharge by one's employer accompanied by some benefits of economic worth. The mere existence, however, of a special benefits program that permits an employer to say it is "retiring" rather than "firing" certain senior employees, does not require the employer to implement that program in a particular way each time it chooses to discharge such an employee. Such a requirement would itself go beyond "plain meaning."

■ The key distinction is that to "discharge" an employee, even one of long service, is not the same as to "retire" him. While involuntary retirement involves a discharge, it also includes the offer of special, favorable conditions that render further employment less necessary. The precise nature of those special, favorable conditions cannot be determined merely by characterizing the employer's action as a retirement. It follows that "retired at the [company's] option" easily embraces an involuntary discharge accompanied by such benefits as the employer chooses, or has chosen, to provide. Under this interpretation both the discharge and the benefits may be "at the [company's] option."

### B. *Illusory Promise.*

■ The district court believed that to make the benefits "at the [company's] option" would "render the promise to supply special pension benefits illusory." E.R. at 27. The district court confused a conditional promise with a statement such as "I promise to sell my car if, when, and to whom I may want to," which, of course, is no promise at all. Harvester promised to pay "special early retirement benefits" to those discharged "in the closing of an entire Company facility." True, this promise was qualified by the terms "primarily" and "at the option of the Company." However, it is clear that this reserved power must be exercised in good faith and in accordance with past practices. The record indicates that it has been so exercised in the past.

### C. *Tax Provisions.*

Finally, the district court ruled that the prerequisites of the plan's tax-exempt status precluded the interpretation Harvester advances. This too was error.

The Harvester plan states that it is designed to qualify as tax-exempt under the ERISA provisions of the Internal Revenue Code. Federal treasury regulations and revenue rulings require a tax-exempt pension plan to define benefits "in accordance with a stipulated formula that is not subject to the discretion of the employer." Rev.Rul. 74–385, 1974–2 C.B. 130 (interpreting 26 C.F.R. 1.401–1). Fielding contends, and the district court concluded, that Harvester's interpretation of the special benefits provision fails under this provision.

The significance of tax exemption requirements in resolving an ERISA dispute is unclear. *Compare Craig v. Bemis Co.,* 517 F.2d 677, 686 (5th Cir.1975) ("plaintiffs may not predicate their contractually-derived pension rights on the Company's tax exemptions") *with Dennard v. Richards Group, Inc.,* 681 F.2d 306, 316 (5th Cir. 1982) ("the fact that the [company's] interpretation of the Plan is contrary to IRS interpretations lends support to a finding of arbitrary construction"). Whatever the relevance of the tax rules in a dispute on the contract, they do not dictate the result for which Fielding contends.

Were Treasury regulations to condemn all payment provisions tied to an ERISA employer's option, Harvester's special early retirement provision would fail even on Fielding's interpretation. Payment of these benefits would continue to depend on Harvester's exercising the option of discharging an employee. This result would not aid Fielding.

■ More to the point, Harvester's special benefits (once awarded) *are* calculated

"in accordance with a stipulated formula that is not subject to the [employer's] discretion." Rev.Rul. 74–385, *supra.* It is only when determining who qualifies for benefits that Harvester exercises any discretion. And on "questions of eligibility" it is settled ERISA law that "wide discretion" may be exercised. *Hancock,* 787 F.2d at 1308. Fielding and the court below are confusing the determination of eligibility for benefits with the computation thereof.

## IV.

### CONCLUSION

We cannot say that Harvester acted unreasonably or with bad faith in interpreting its plan.

*REVERSED.*